# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Jonathan Scarborough, | Civil No. 15-1633 (DWF/KMM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Federated Mutual Insurance Company, | |
| Defendant. | |

David H. Redden, Esq., and John A. Fabian, III, Esq., Fabian May & Anderson, counsel for Plaintiff.

Britt M. Gilbertson, Esq., Danielle W. Fitzsimmons, Esq., and Gregory J. Stenmoe, Esq., Briggs & Morgan, PA, counsel for Defendant.

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendant Federated Mutual Insurance Company (generally, "Federated"). (Doc. No. 123.) Plaintiff Jonathan Scarborough filed a claim against Federated alleging that he was terminated in violation of Minnesota's Whistleblower Act ("MWA"), Minnesota Statute §§ 181.931-.932. For the reasons set forth below, the Court grants Federated's motion.

# BACKGROUND

I. **Factual Background**

The facts of this case were previously set forth in an Order dated February 1, 2017. (Doc. No. 88.) In that Order, the Court granted Federated summary judgment on Scarborough's MWA claim. Plaintiff appealed and the Eighth Circuit Court of Appeals vacated and remanded the case for reconsideration in light of the Minnesota Supreme Court's decision in *Friedlander v. Edwards Lifescis., LLC*, 900 N.W.2d 162, 166 (Minn. 2017). (Doc. No. 113.)

Federated is a national mutual insurance company that offers insurance primarily to businesses and business owners. Scarborough was a Regional Marketing Manager ("RMM") for Federated for the Central Region, which includes Kansas, Missouri, and Nebraska. (Doc. No. 126 ("Fitzsimmons Decl.") ¶ 3, Ex. 1. ("Scarborough Dep.") at 12; *id.* ¶ 3, Ex. 9.) He had held that position since 2012. Scarborough supervised six District Marketing Managers ("DMM") and his role as RMM included reviewing and approving DMMs' expense accounts. (*Id.* ¶ 3, Ex. 10, ¶ 16.)

One of Scarborough's DMMs was Frederick Johnston. On July 1, 2014, Johnston's assistant submitted Johnston's expense report for his company credit card. (*Id.* ¶ 3, Ex. 16.) The report included a personal expense for custom framing. (*Id.* ¶ 3, Ex. 15.) The next day, the Marketing Administration Manager Rhonda Kath e-mailed Johnston about the framing expense. (*Id.* ¶ 3, Ex. 15; *id.* ¶ 3, Ex. 4 ("Kath Dep.") at 28.) Johnston lied to Kath about the expense, claiming that it was for laminating services and printer ink. (Fitzsimmons Decl. ¶ 3, Ex. 15; Kath Dep. at 25-26.) Unconvinced, Kath

inquired directly with the store and learned that the expense was for framing pictures of Johnston's European vacation. (Fitzsimmons Decl. ¶ 3, Ex. 15; Kath Dep. at 35.)

With the lie rooted out, Kath e-mailed her supervisor and General Manager-Marketing Services, Martha Kearin, who brought in Scarborough's supervisor Michael Pennington. (Fitzsimmons Decl. ¶ 3, Ex. 17.) Pennington then updated Scarborough. (*Id.* ¶ 3, Ex. 18.) On July 7, 2014, Pennington and Scarborough met to discuss Johnston's expenses. During this meeting, Scarborough mentioned that Johnston liked "nice and fancy" things and added by way of example that Johnston liked to hold meetings at the law offices of Husch Blackwell, even though he could probably find a less expensive venue. (Scarborough Dep. at 68-69.) After hearing that, Pennington replied, "What are you talking about? [Johnston] gets those meeting rooms for free." (*Id.*) Scarborough then explained that Johnston had been submitting invoices for those meetings. (*Id.*) Their conversation ended with Scarborough telling Pennington that he would investigate the issue further. (*Id.* at 52, 69.)

On July 14, 2014, Scarborough exchanged e-mails with Husch Blackwell, which confirmed that the meeting rooms were provided free of charge. (Fitzsimmons Decl. ¶ 3, Ex. 20.) Scarborough forwarded the e-mails to Pennington, and they agreed to talk with Johnston about the invoices in addition to the framing expense. (*Id.*)

Kearin continued her investigation into Johnston's expense reports from July 2012 to July 2014, along with invoices Johnston submitted to support his out-of-pocket expenses. (*Id.* ¶ 3, Ex. 22.) She forwarded the reports and invoices to Pennington, who forwarded them to Scarborough. (*Id.* ¶ 3, Exs. 23-24.) Her report showed that Johnston

3

had submitted, and Scarborough had approved, over $5,000 in out-of-pocket expenses related to the Husch Blackwell meeting rooms in amounts ranging from $250 to $350 per meeting. (*Id.* ¶ 3, Exs. 24-25; Scarborough Dep. at 82-84.)

On July 21, 2014, Scarborough and Pennington met with Johnston. (Scarborough Dep. at 87-88; Fitzsimmons Decl. ¶ 3, Ex. 2 ("Pennington Dep.") at 109.) Prior to the meeting, Pennington asked if Scarborough had prior knowledge about the false invoices, and Scarborough denied it. (*See* Fitzsimmons Decl. ¶ 3, Ex. 26.) During the meeting, Johnston admitted to submitting fraudulent invoices and receiving payment for them. (Pennington Dep. at 109-111.) Later that day, Johnston called Pennington to tell him that Scarborough had known about Johnston's scheme and that Scarborough had suggested to another DMM, Braxton Weaver, that he do the same thing. (Fitzsimmons Decl. ¶ 3, Ex. 26; *id.* ¶ 3, Ex. 5 ("Johnston Dep.") at 170-72.)

On July 24, 2014, Scarborough met with Pennington and Pennington's supervisor, Mike Kerr. (Fitzsimmons Decl. ¶ 3, Ex. 26.) At the July 24 meeting, Kerr asked Scarborough whether he had prior knowledge of Johnston's invoicing practice. Again, Scarborough "aggressively" denied having any prior knowledge. (*Id.*)

Pennington and Kerr continued to investigate whether other DMMs had also falsified invoices. For example, Pennington reached out to Weaver to follow up on the claim that Scarborough knew about Johnston's fraudulent expenses and recommended the practice to other DMM's. (*Id.* ¶ 3, Ex. 26; *id.* ¶ 3, Ex. 7 ("Weaver Dep.") at 45-48.) When asked if Scarborough, Weaver's supervisor, was aware that Johnston was submitting false Husch Blackwell invoices, Weaver responded "yes." (Weaver Dep. at

4

45-47, 52-53.) Weaver also answered "yes" when asked if he told Pennington that Scarborough recommended to him that he contact Johnston for "more details on how to do the same with respect to submitting fraudulent practices as an avenue to pocket money." (*Id*. at 61.)

On July 30, 2014, Scarborough met with Kerr and Pennington. (Fitzsimmons Decl. ¶ 3, Ex. 3 ("Kerr Dep.") at 70; Scarborough Dep. at 55.) At this meeting, Scarborough stated that Johnston's actions may have been illegal. Scarborough also allegedly told Pennington and Kerr that he suspected that Johnston was violating tax law and that Federated likely violated tax laws because it had not applied the proper withholdings to the funds that Johnston had taken. (Scarborough Dep. at 60.) Kerr and Pennington either deny or do not remember that Scarborough brought up tax violations or other illegalities related to Johnston's false invoices. (Kerr Dep. at 86; Pennington Dep. at 165-66.) In addition, at the meeting, Kerr confronted Scarborough about his failure to use the company's travel team when scheduling work travel and Scarborough's alleged misuse of referral credits on a company cruise. (Scarborough Dep. at 55-58.)

On August 4, 2014, Pennington, Scarborough, and Johnston met in Kansas City. (*Id*. at 110; Pennington Dep. at 200, 206-07.) Pennington explained that due to the findings regarding Johnston's unethical practices, he could not continue in management at Federated. Ultimately, Johnston was offered a choice of resigning or being demoted. After Johnston left the meeting, Pennington then issued a warning letter to Scarborough because Scarborough continued to deny his prior knowledge of Johnston's fraudulent scheme. The letter read in part:

5

> Based upon conversations you and I had many months prior to this matter arising, as well as other information I have received during the investigation, I find that your abject denials lack credibility and that you were not honest with Mike and me – even though we allowed you multiple opportunities to tell us the truth during separate discussions.

(Fitzsimmons Decl. ¶ 3, Ex. 28.) Scarborough was allowed to continue in his RMM position, but from Federated's perspective, Scarborough was on thin ice. (*Id.* ("[A]ny future misconduct will likely result in the termination of your employment with Federated.").)

By August 20, 2014, Federated would demote and then ultimately fire Scarborough. What happened between August 4 and August 20 depends on the party you ask. According to Scarborough, Pennington manufactured evidence to create grounds to have Scarborough fired. According to Federated, after August 4, it learned that Scarborough had charged personal expenses to his company credit card and that Scarborough began spreading rumors that DMMs were being fired. (*Id.* ¶ 3, Ex. 31; Kerr Dep. at 103.)

After his demotion on August 13, 2014, Scarborough was given two options to remain at Federated: return to the field as Marketing Representative or work in Special Accounts. (Kerr Dep. at 152.) Scarborough chose to move to Special Accounts in Tennessee. (Fitzsimmons Decl. ¶ 3, Ex. 38.) Federated agreed to pay for the move. (Kerr Dep. at 157.)

On August 18, 2014, Kerr learned that Scarborough had called another RMM, Christopher Terry, and told Terry that Federated was going to terminate his employment. (*Id.* at 163-164; Fitzsimmons Decl. ¶ 3, Ex. 8 ("Terry Dep.") at 26, 30-31, 39-40, 51-52;

*see also* Fitzsimmons Decl. ¶ 3, Ex. 43 at 3.)[1] Federated maintains that there was no truth to Scarborough's statement. (Kerr Dep. at 166-67.)

On August 20, 2014, Kerr called Scarborough and terminated his employment. (*Id.* at 173.) Federated asserts that Scarborough's call to Terry was the "straw that broke the camel's back" in a series of accumulated issues. (*Id.* at 166-67.) Kerr notes that despite several warnings, Scarborough continued to use poor judgment and decision making, and that Scarborough's latest infraction (telling another RMM that Federated was going to terminate his employment) came after Scarborough's last warning. Federated maintains that Pennington was not involved in the decision to terminate Scarborough. (*Id.* at 171-73.) Johnston ultimately resigned effective August 29, 2014.

On December 26, 2014, Scarborough filed suit in District Court of Johnston County, Kansas. (Doc. No. 1-1.) The Complaint alleged claims for unjust enrichment and breach of an implied contract. (*Id.*) Federated removed the case to the United States District Court for the District of Kansas. (Doc. No. 1.) Federated then sought to have the case transferred to the District of Minnesota. (Doc. No. 9.) In its motion to transfer, Federated argued that Scarborough's claims were governed by a forum selection clause in his RMM Employment Agreement. (*See* Doc. No. 76-1.) Scarborough opposed the transfer. (Doc. No. 11.) The Kansas court concluded that Scarborough's claims were

---

[1] Unbeknownst to Federated, between July 2014 through October 2014, Scarborough recorded at least 111 conversations with Federated employees, including Kerr and Pennington, without their knowledge. (Scarborough Dep. at 95, 98-100, 110.) Federated discovered these recordings during discovery.

7

subject to a valid forum selection clause and transferred the case. (Doc. No. 14.) Scarborough did not appeal that order.

Scarborough then amended his Complaint twice. (Doc. Nos. 32 & 38.) Scarborough's Second Amended Complaint, the one at issue here, alleges a single claim for breach of the MWA. (Doc. No. 38.) In its Answer, Federated counterclaimed for breach of the RMM Employment Agreement's forum selection clause. (Doc. No. 39.)[2]

## II.     Procedural Background

In 2016, Federated moved for summary judgment. In the February 1, 2017 Order, the Court granted Federated's motion, holding that "because Scarborough has failed to show that his statements to Federated constituted a 'report' under the MWA, Federated is entitled to summary judgment." (Doc. No. 88 at 12.) The Court reasoned, in part, that "the 2013 amendment [to the MWA] did not abrogate the requirements that, to be cloaked with the protections of the MWA, the employee must make his report be for the purpose of exposing an illegality." (*Id*. at 10.) The Court did not previously reach the issues of causation and pretext.[3]

On June 26, 2017, Scarborough appealed the Court's summary judgment order to the Eighth Circuit Court of Appeals. (Doc. No. 99.) On August 9, 2017, the Minnesota

---

[2]     Plaintiff later filed a separate lawsuit in the Western District of Missouri, Case No. 4:16-cv-00505-REL. That complaint asserts defamation and tortious interference claims against Pennington, Johnston, and Weaver. (Fitzsimmons Decl. ¶ 3, Ex. 47.)

[3]     The Court also granted summary judgment in favor of Federated on its counterclaim for breach of a forum selection clause. That claim is not presently before the Court.

8

Supreme Court issued a decision in *Friedlander*, holding that the 2013 amendment to the MWA, defining "good faith," eliminated the requirement that a whistleblower act with the purpose of exposing an illegality. The Eighth Circuit Court of Appeals later issued an order, "vacat[ing] the judgment of [this Court] and remand[ing] for reconsideration of summary judgment in light of the Minnesota Supreme Court's decision in *Friedlander*." (Doc. No. 113.) The Court does so below.

## DISCUSSION

### I. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not

9

rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.  MWA Claim

The Minnesota Whistleblower Act ("MWA") prohibits retaliation by an employer when, among other things, an employee, "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer . . . ." Minn. Stat. § 181.932, subd. 1. Retaliation claims under the MWA may be proven by direct evidence or under the *McDonnell Douglas* burden-shifting framework. *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013). Under this test, the employee must first establish a prima facie case of retaliation by showing: (1) statutorily protected conduct; (2) adverse employment action; and (3) a causal nexus between the two. *Id*. at 829. If the employee can establish a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nonretaliatory reason for its action. *Id*. If the employer meets its burden of production, the employee must demonstrate that the employer's articulated justification is pretextual. *Id*.

Federated argues that Scarborough's MWA claim fails as a matter of law because Scarborough did not engage in protected conduct, Scarborough cannot prove causation, and, in any event, that Federated articulated multiple legitimate, non-discriminatory reasons for its actions and Scarborough cannot establish pretext. Scarborough opposes

10

Federated's motion and argues that he has sufficient evidence to demonstrate that Federated's adverse actions were in retaliation for his protected conduct.

### A. Protected Activity

The first step for an MWA claim is determining whether the employee engaged in statutorily protected conduct by, in this case, reporting in good faith a violation or suspected violation of law. *See, e.g.*, *Pedersen v. Bio-Med Applications of Minn.*, 992 F. Supp. 2d 934, 939; Minn. Stat. § 181.932, subd. 1. The plaintiff has the burden of demonstrating that he engaged in statutorily protected conduct. *Pedersen*, 992 F. Supp. 2d at 939. A report is defined as, "a verbal, written, or electronic communication by an employee about an actual, suspected, or planned violation of a statute, regulation, or common law, whether committed by an employer or a third party." Minn. Stat. § 181.931 subd. 6. In *Friedlander*, the Minnesota Supreme Court held that the judicially developed definition of "good faith" was abrogated by the definition added to the MWA through the 2013 amendment. *Friedlander*, 900 N.W.2d at 166. Thus, after *Friedlander*, a report is made in good faith "as long as [it is] not knowingly false or made with reckless disregard of the truth." *Id*. at 165-66. The Court notes that the *Friedlander* decision focused on the "good faith" requirement under the MWA. Separate and distinct from the element of "good faith" is the requirement that a "report" be made. Thus, Scarborough must demonstrate both that he made a report and that the report was made in good faith. Whether a report is made in good faith is a question of fact, but whether Scarborough made a report may be decided as a matter of law. *Freeman v. Ace Tel. Ass'n*, 404 F. Supp. 2d 1127, 1139 (D. Minn. 2005), *aff'd*, 467 F.3d 695 (8th Cir. 2006).

Scarborough has not presented, and the Court is unaware of, any authority holding that *Friedlander* impacts the prior caselaw dealing specifically with the requirements of a "report" that are unrelated to the element of "good faith." However, *Friedlander* explained that, prior to the 2013 Act, courts interpreted the phrase "good faith" to have two elements—the content of the report and the reporter's purpose. *Friedlander*, 900 N.W.2d at 165. In analyzing the reporter's purpose, courts held that to act in good faith, the reporter must have acted with the purpose of blowing the whistle, or to expose an illegality. *Id*. After *Friedlander*, courts now look only to the content of the report, keeping in mind that the phrase "good faith" no longer includes the requirement that the reporter act with the purpose of exposing an illegality. *Id.* at 165-66.

Here, Scarborough alleges that he made three reports. First, Scarborough argues that he reported a violation on July 7, 2014, when he told Pennington that Johnston liked fancy things, including paying for meeting rooms at Husch Blackwell. Second, Scarborough argues that he reported a violation on July 14, 2014, when he forwarded an e-mail from Husch Blackwell confirming that the meetings were free. And third, Scarborough argues that he reported a violation on July 30, 2014, when he allegedly told Pennington and Kerr that Johnston's invoicing practice was illegal and that Federated was violating tax law related to Johnston's withholding taxes.

Scarborough claims that on July 7, 2014, he reported that Johnston was submitting expenses for meeting rooms that were actually free. However, the record demonstrates that on July 7, 2014, Scarborough and Pennington met to discuss Johnston's submission of receipts for frames and that Scarborough stated that Johnston liked things "nice and

12

fancy," and then shared that, for example, Johnston liked to hold meetings at Husch Blackwell even though he could find a less expensive location. This statement, however, does not implicate any "actual, suspected, or planned violation" because Scarborough, at this time, did not know that the Husch Blackwell rooms were actually free. In fact, the record suggests the opposite—that at the time of this meeting, Scarborough only suspected that Johnston was paying for the Husch Blackwell rooms, but could have found a less expensive venue. Indeed, the record demonstrates that Scarborough actually learned that the rooms were free from Pennington. Because Scarborough did not know the rooms were free, he could not, at this point, report that Johnston was falsifying expense reports for the rooms. Therefore, Scarborough did not make a report during this meeting.[4]

Scarborough also relies on an alleged report made on July 14, 2014, when he forwarded an e-mail exchange between him and Husch Blackwell to Pennington that confirmed that the meeting rooms at Husch Blackwell were free of charge. In addition, Scarborough claims that on July 30, 2014, he made a good-faith report when he told Kerr and Pennington that Johnston's conduct was illegal and raised the possibility that Federated and Johnston could have violated tax laws. While these reports, at least with

---

[4] *Friedlander* concluded that a legislative amendment defined the phrase "good faith," so as to deem reports to be made in "good faith" so long as they were not knowingly false or in reckless disregard of the truth. *Friedlander*, however, did not change the definition of a "report"—which requires a communication about an actual, suspected, or planned violation. Here, Scarborough could not "report" an actual, suspected or planned violation (falsifying expense reports) if he did not yet know or suspect that was occurring.

13

respect to the expense report misconduct, came after Federated already knew about Johnston's misconduct, the Court concludes that, after *Friedlander*, they are entitled to protection under the MWA. Looking only to the content of the reports, they constitute communications about an actual, suspected, or planned violation.[5]

Based on the above, the Court concludes that Scarborough has demonstrated that he made a "report" under the MWA on July 14 and July 20, 2014. The Court will therefore analyze the remaining elements of causation and pretext below.

### B. Causal Connection

To prevail on his MWA claim, Scarborough must also prove a causal connection between his reports and Federated's adverse actions. Scarborough may do so with either direct evidence or under the *McDonnell Douglas* burden-shifting framework.

Scarborough claims direct evidence of retaliation. Direct evidence is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Wood*, 705 F.3d at 828. Here, Scarborough asserts that he was issued a written warning for repeatedly and truthfully denying that he had prior knowledge of the unlawful Husch Blackwell scheme that he claims to have reported. More specifically, Scarborough argues that had he not reported Johnston's illegal conduct, he would not have received a warning, been

---

[5] Defendants deny that Scarborough ever communicated alleged tax violations. However, on Defendant's motion, the Court must construe the facts in the light most favorable to Scarborough.

demoted, or eventually terminated. In support, Scarborough points to Kerr's testimony that Scarborough was demoted, in part, because he continued to deny prior knowledge of Johnston's unlawful activity and Pennington's allegation that Scarborough had bad motives in making his reports. In addition, Scarborough points to evidence that Kerr acknowledged that Scarborough was terminated not only for his phone call with Terry, but also for issues giving rise to the warning and demotion. Scarborough argues that a reasonable fact finder could conclude that Scarborough's reports of Johnston's unlawful conduct were specific motivating factors in the adverse actions.

The Court concludes that this evidence fails, as a matter of law, to demonstrate direct evidence of prohibited retaliation. Scarborough claims that he was retaliated against for denying prior knowledge of the fraudulent Hursch Blackwell meeting-room scheme. This is not the same as being retaliated against for reporting Johnston's misconduct in submitting false expense reports. Indeed, Scarborough's own argument underscores that he believes he was retaliated against because Federated thought Scarborough was complicit in Johnston's fraudulent scheme and lied about it, *not* because he reported the misconduct. This is a critical distinction that defeats Scarborough's argument on the point of causation.

Scarborough also argues that facts in the record support an inference of a causal connection. For example, Scarborough points to evidence that Kerr and Pennington knew of Scarborough's protected conduct and that knowledge, in conjunction with the timing of the adverse actions, is enough to create an inference of causation. Specifically, Scarborough points to evidence that Federated issued a written warning to Scarborough

15

less than a month after he reported Johnston's conduct, demoted Scarborough nine days later, and ultimately terminated Scarborough's employment a week after his demotion. Scarborough also suggests that, after he reported Johnston's activity, Pennington began to dig into Scarborough's expenses and took steps to discredit Scarborough.

A retaliatory motive may be inferred from circumstantial evidence pertaining to temporal proximity and an employer's knowledge of the employee's protected conduct. *Freeman*, 404 F. Supp. 2d at 1141. However, temporal proximity alone is generally insufficient to establish an inference of retaliatory motive. *Harnan v. Univ. of St. Thomas*, 776 F. Supp. 2d 938, 948 (D. Minn. 2011). Here, there is no evidence beyond the temporal proximity of adverse actions, and the temporal proximity is not close enough to create an inference of retaliatory intent. *See id*. at 948 (finding a one-month timespan between protected activity and the preparation of a termination notice insufficient to establish causation in an MWA claim).

In addition, the presence of intervening events can undermine any inference raised by temporal proximity. *See Freeman v. Ace Tel. Ass'n.*, 467 F.3d 695, 698 (8th Cir. 2006). Here, the record demonstrates that Federated believed that Scarborough knew about Johnston's fraudulent invoice practice and recommended it to other employees. In addition, Federated maintains that it discovered that Scarborough himself improperly sought reimbursement for personal expenses, collected cruise referral credits that belonged to Federated, called several of Johnston's Marketing Representatives and spread a false rumor that Johnston was being terminated, falsely told Terry that Federated was on a "witch hunt" and Terry was likely to be fired along with another RMM, and

16

engaged in other misconduct.  Scarborough maintains that he did not have prior knowledge of the Husch Blackwell scheme, that he did not tell Johnston's marketing representatives that Johnston was fired, that he did nothing wrong in connection with the cruise referral program or in booking his own travel, and that his conversation with Terry was "trivial."  Be that as it may,  Federated has pointed to evidence that shows, at a minimum, a good faith basis for its belief that Scarborough engaged in the above misconduct.  For example, another Federated employee testified that he told Pennington that Scarborough recommended to him that he contact Johnston to get details on how to submit fraudulent expenses.  (Weaver Dep. at 61.)  It is also undisputed that Johnston told Pennington that Scarborough knew about the Husch Blackwell scheme and that Scarborough called Johnston's marketing representative and told them he was being terminated.  (Johnston Dep. at 170-72; Kerr Dep. at 103.)  Even if the Court could infer a causal connection from the temporal proximity of Scarborough's alleged reports and the adverse employment actions, this connection is undermined by Scarborough's intervening conduct.

Accordingly, viewing the evidence in the light most favorable to Scarborough, the Court concludes that Scarborough has not pointed to sufficient evidence that reasonably supports a causal link between any reports and the adverse employment actions.  Therefore, Scarborough fails to establish a prima facie case of retaliation under the MWA.  Further, even if Plaintiff could establish a prima facie case, as discussed below, he nevertheless fails to demonstrate that Federated's proffered reasons were pretext for unlawful retaliation.

### C. Legitimate, Non-Retaliatory Reason and Pretext

Even assuming that Scarborough could make out a prima facie case of protected activity and causation, Federated has articulated legitimate, non-retaliatory reasons for his warning, demotion, and termination. The record demonstrates that in the two months leading to Scarborough's termination, Federated determined that: (1) Scarborough knew of and approved Johnston's fraudulent invoice practices and encouraged another DMM to do the same; (2) Scarborough collected cruise referral credits that belonged to Federated; (3) Scarborough called several of Johnston's Marketing Representatives and spread a false rumor that Johnston was being terminated; (4) Scarborough improperly sought reimbursement for personal expenses; (5) Scarborough engaged in other misconduct; and (6) Scarborough falsely told Terry that Federated was on a "witch hunt" and Terry was likely to be fired along with another RMM. Because Federated articulated these reasons, the burden shifts back to Scarborough to point to evidence that creates a genuine issue of fact for trial that these proffered reasons for terminating Scarborough were pretextual.

Scarborough's arguments for pretext are nearly identical to those in support of causation. First, Scarborough argues that Federated's asserted reasons for the adverse actions are unworthy of credence because Federated had no basis for the written warning and demotion, Federated failed to follow its own policies, and it is unlikely that Federated would have terminated Scarborough solely for his phone conversation with Terry. Scarborough also maintains that there is evidence of retaliatory animus, such as inquiring into Scarborough's expenses, allegedly taking actions to discredit Scarborough, and falsely alleging that Scarborough knew about Johnston's scheme.

The burden of proof to establish pretext is higher than that required to establish a prima facie case. Pretext can be established by showing that an employer's justification "is unworthy of credence" or "by showing that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies." *Childs v. Fairview Health Servs.*, Civ. No. A16-849, 2016 WL 6923709, at *4 (Minn. Ct. App. Nov. 28, 2016) (quotation marks and citations omitted). Ultimately, "[t]he relevant question is whether a reasonable jury could find that [the employer's] proffered reason for the termination was a mere pretext to mask retaliatory animus." *Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 837 (8th Cir. 2007).

Here, Scarborough's evidence of pretext fails. First, the Court notes that while Scarborough denies any prior knowledge to Johnston's scheme and that he told Johnston's MRs that Johnston was fired, Scarborough seems to acknowledge, or at least not deny, that he used Federated cruise referrals to book personal travel, used his corporate card for personal expenses (which he later repaid), and told Terry that Federated was likely to fire him and potentially another RMM. Scarborough now argues that any such misconduct does not warrant dismissal, was not actually improper, or was "trivial." However, the decision as to whether this particular conduct justified Scarborough's termination was up to Federated. *See, e.g.*, *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 705 (8th Cir. 2005) (noting that courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers"). Viewing the record in light most favorable to Scarborough, the Court finds

that Scarborough has failed to present sufficient evidence to raise a genuine issue of fact that Federated's proffered reasons for warning, demoting, and ultimately terminating Scarborough were pretext for retaliation. Thus, the Court grants Federated's Motion for Summary Judgment on Scarborough's MWA claim.

## CONCLUSION

For the foregoing reasons, the Court grants Federated's motion for summary judgment as to Scarborough's MWA claim. Therefore, **IT IS HEREBY ORDERED** that: Defendant Federated's Motion for Summary Judgment (Doc. No. [123]) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: March 29, 2019          s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             United States District Judge